49

# United States District Court

## For the Eastern District of Michigan

### Southern Di~

Case: 2:23-cv-12684
Assigned To : Friedman, Bernard A.
Referral Judge: Stafford, Elizabeth A.
Assign. Date : 10/24/2023
Description: COMP KAIMOWITZ V.
THE MICHIGAN BAR, ET. AL (KB)

Cas~

|  |  |
|---|---|
| Gabriel Hillel Kaimowitz, Esq. | ) |
| Plaintiff | ) |
|  | ) |
| v, The Michigan Bar, The Florida Bar, | ) |
| and John T. Berry, | ) |
| Defendants_____ | ) |

**Jury Trial Demanded**

## CIVIL RIGHTS COMPLAINT FOR INJUNCTIVE
## and DECLARATORY RELIEF and DAMAGES RESULTING from
## A CRIMINAL CONSPIRACY TO DISCREDIT THE ALLEGATIONS
## OF THIS NEW YORK ATTORNEY IN GOOD STANDING SINCE 1969

### Preliminary Statement

Plaintiff whistle-blower is a member in good standing in New York and courts in at least five federal circuits, since 1969-1971; an honored member of the Michigan Bar Emeritus, after 52 years of affiliation; and a retired member of the Florida Bar, effective Aug. 15, 2016, with approval by its director and membership committee while he was suspended; *but disbarred Dec. 1, 2016, by John A. Tomasino, Florida Supreme Court Clerk.* The Michigan and Florida Bars have conspired to deny Plaintiff meaningful access to courts in their respective states, and to publications and memberships, to discredit his allegations of racism. fraud, and corruption, in violation of his First and Fifth Amendment rights under the U.S. Constitution.

The conspiracy was coordinated for years through John T. Berry, Esq., a Florida Bar member who was responsible for its disciplinary actions, and a Michigan Bar member who was its director, 2000-2006. Berry, now in Abilene, TX. still is eligible to practice law in Florida, but not in Michigan.

Plaintiff has been targeted in both jurisdictions because of whistle-blowing and his *successful* unorthodox legal practice without apparent client control. **His litigation strategy to empower the poor has been disparaged by Defendants and courts they control, because it runs counter to their goal of a lawyer for every eligible poor person in civil matters.**

What strategy? Plaintiff has brought 1) civil rights actions *pro se*, as a lawyer and 2) acted on behalf of children, people said to be mentally disabled, and/or institutionalized, through next friends he has selected.

Plaintiff described this strategy in a 244-page treatise funded by the federal government in 1979-80--*Independent Advocacy: A Strategy for the Delivery of Effective Legal Services to Dependent People (1981)*. Its text/footnote connections were sabotaged while it was being edited.

The Reagan Administration interfered with distribution to its intended audience---every legal service and legal aid program in the United States and its territories. Few if any received copies. Worse was to come. Defendants now deny him meaningful access to their courts and publications through clerks, judges and editors who reject all documents from Plaintiff.

Retaliation against Plaintiff began in Michigan, when Plaintiff in 2010-11, openly challenged dues imposed on its inactive members by its bar, at the direction of Mr. Berry. Plaintiff had to show cause in both jurisdictions why he should not be disciplined for engaging in the unauthorized practice of law.

Ongoing retaliation in Florida against Plaintiff began in 1994, after the U.S. Court for the 11th Circuit decided there was an open question whether attorneys could practice in the federal court system based on an out-of-state license, if they chose not to pay Bar dues where they resided and/or worked. See *Kaimowitz v. Florida Bar*, 996 F.2d 1151, 1153 (11th Cir. 1993). **Plaintiff raises that issue again here.**

## I.     The Parties to the Complaint

**1. The Plaintiff is** Gabriel (Gabe) Hillel Kaimowitz, Esq., 4411 S.W. 34th St.,

Condo 1305, Gainesville, FL 32608 Phone (352) 375-2670  gabrielhillel@gmail.com

`        2. The Defendants`  are the Michigan State Bar, 306 Townsend St., Lansing, MI

48933-2012.. Phone: (517) 346-6300. Toll Free: (800) 68-1442.  All lawyers are members
and all judges, including federal jurists, must or may be members.. and

3.  The Florida State Bar, 651 E. Jefferson St., Tallahassee, FL 32399-2300,
Phone (850) 561-5600.    All lawyers and judges are mandatory members.

4.  John T. Berry, Esq., Savannah Oaks Blvd., Abilene, TX, 79602-1377,
Phone (850) 798-5527. Florida Bar member, former Michigan Bar executive director.

## II. Basis for Jurisdiction

5.This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 22001 & 2202,
This case and  controversy arise under the U.S. Constitution and federal laws.  This is a
civil rights cause against all Defendants arising from the actions they took against Plaintiff.

6.  This action also sounds in diversity, pursuant to 28 U.S.C. §1332.   $100,000
is sought in damages, exclusive of costs, and attorney fees.  This action is brought in a
jurisdiction  where Defendants conspired to deprive Plaintiff of constitutional rights.

## III. Statement of Claim--Background

7. Plaintiff, a whistle-blower since 1964,  was one of several law graduates who
challenged the constitutionality of the  New York Bar character & fitness review.

8. See *Law Students Civil Rights Research Council (LSCRRC) v. Wadmond,*
299 F. Supp. 117 (S.D./E.D.N.Y. 1969)(three-judge court.)

9. For the majority, Judge Henry Friendly of the U.S. Court for the 2nd
Circuit  stated that the panel could not rule on the constitutionality of the oral interview
process, because none of the plaintiffs sought to pursue admission.

10. Plaintiff then became the only one to submit to the oral interview process.  He objected to inquiry into the scores of articles he wrote or edited as a journalist.

11. Especially controversial was a brochure Plaintiff ghosted about *Your Right to Welfare*; he wrote  releases and  engaged in public relations activities for his employer, the Center On Social Welfare Policy & Law, NY (1967-69).   Welfare applicants and recipients at that time had no known right to welfare (public assistance.)

12. Plaintiff also controversially received publicity while at NYU School of Law, for an ACLU fund he set up for conscientious objectors to an unjust war, with GI Bill funds he got for the first time after the U.S. became involved  directly in Viet Nam.

13. In 1964, while writing/editing for  *TV Age* trade magazine, Plaintiff led a successful walkout to get recognition for a Group 4  bargaining unit after the publisher refused to publish a staff whistle-blowing article about ongoing violations of the Federal Communications Act and regulations, by broadcasters and sponsors who were trying to make up for the four days of commercial free airing they provided after the assassinations of President John F. Kennedy and Lee Harvey Oswald in 1963 by stuffing ads illegally.

14. The National Labor Relations Board upheld an unfair practice charge against the employer who insisted that a staffer apologize for  a satirical but factual article which had been published anonymously, as were most articles presented in that trade magazine.

15.   In light of that experience, Plaintiff applied to law school, and became a volunteer in the voting rights/education project, in the Freedom Summer in the South.

16. In 1965, Plaintiff organized a nationally publicized demonstration to protest corruption at an historically black Bishop College in Dallas,  TX.

17.During the character & fitness interviews, Plaintiff would not swear to uphold the New York Canons of Ethics as long as they required counsel to admonish a client who interrupts court proceedings, and then if that client continues, to end the relationship.

18.Plaintiff was representing welfare recipients at administrative hearings at the time. as part of a national campaign to get money for special needs not provided in their budgets.

19. Poor people frequently disrupted the proceedings, and needed assurance that counsel represented them, and not the system.

20. The bar committee recommended that Plaintiff not be admitted to practice in New York, because of the *TV Age* and Bishop College events, and his refusal to uphold the Bar's Canons of Ethics.

21. The New York Appellate Division rejected that recommendation and ordered his admission.   Plaintiff was admitted in December 1969 to the New York Bar.

22. Plaintiff has been in good standing in that jurisdiction since then.

23. In August 1969, Plaintiff was one of 82 lawyers attending a federally funded three week training session in Vail, CO, **about the use of test case and class action litigation** to raise issues for judicial resolution, and public discussion, involving poor people in welfare, education, housing, employment, bank loans, etc.

24. The attorneys formed Poverty Lawyers for Effective Advocacy (PLEA).

25. Plaintiff was elected PLEA secretary.

26. PLEA was created to oppose threats of  gubernatorial vetoes of migrant worker legal services programs in California and Florida, where Cesar Chavez's United Farmworkers Association was organizing. The migrant workers were being represented by federally funded California Rural  Legal Assistance (CRLA) to the dismay of Gov. Ronald Reagan, and by a comparable program in Florida where Gov. Claude Kirk was the first GOP governor in 90 years.   Both federal programs were using test case strategies.

27. Upon return to New York, and still not admitted to practice, Plaintiff was terminated for incompetence by the Center Board chair Paul Dodyk, a Wall Street lawyer.

28. Plaintiff demanded a hearing which was reported in the Columbia *Spectator*. The Board dismissed the charges.  Plaintiff was reinstated, and given a raise in 1970.

29. Then Plaintiff received a Reginald Heber Smith Fellowship (Reggie), and he was assigned to Michigan Legal Services (MLS) in Detroit.

30. Alan Houseman, also an NYU Law grad and former intern at the Center, was founder/director of MLS, a state support center for local services/aid agencies.

31. In Michigan, in 1971, Plaintiff was informed by a Michigan Bar character & fitness Committee member that he would not be admitted in Detroit, pending an investigation into his alleged unauthorized practice of law in juvenile court in Wayne County.

32. On advice of Judge Charles Farmer, Plaintiff was admitted in Ann Arbor, MI where he lived.  The unauthorized practice of law was never mentioned again.

33. During or before 1972, the Michigan Bar shared Plaintiff's file with State Police.

34. "WASHINGTON, Nov. 30—The Federal Bureau Investigation's files on Representative Robert F. Drinan, a Roman Catholic priest, contained summaries of several of his sermons.... Gabriel Kaimowitz, a lawyer in Michigan, found a picture of the family St. Bernard in his state police records."   See Steven V. Roberts, "Capital's Latest Game is Match that Dossier," *The New York Times*, Dec. 1, 1977

35. In Michigan, Plaintiff established a positive national and international reputation.

36. Plaintiff did so through lawsuits, published law review articles, and press coverage of test case and proposed class action litigation, primarily on behalf of children and persons said to be mentally disabled.   They cannot give informed consent to legal representation.

37. See articles and cases listed in *Goggle Scholar* under Gabe or Gabriel Kaimowitz;. See hundreds of citations for Gabe Kaimowitz in newspapers.com. and nearly 40 references in the *New York Times* under various headings.

38. In the 1970s, Plaintiff split ideologically from Houseman, in a controversy which continues to the present.  See Gabe Kaimowitz, "Comment, Legal Services: Marching to a Different Drummer, A Response to Alan Houseman's Thoughts on the Future of Legal Services, and Houseman's Reply," *NLADA BRIEFCASE*, June 1978.  See discussion, *infra*. The articles have been cited a half dozen times since then in major publications.

39. Plaintiff supports the test case/class action approach in that article in civil litigation to empower  poor people and their organizations, e.g., the National Welfare Rights Organization (NWRO).  See, e.g., *Goldberg v. Kelly*, 397 U.S. 254 (1970).

40. Houseman favors the traditional Bar goal in civil litigation, that is, a lawyer for every eligible poor person, which would mean a lawyer for each party in a divorce.

41. Houseman was among those responsible for creation in 1974 of the Legal Services Corporation (LSC), an enterprise which was intended to separate legal assistance from political control. and ideological pursuits.  LSC has adopted Houseman's goal.

42. Test case litigators including Plaintiff and Houseman's MLS, thrived under the War on Poerty funded Office of Economic Opportunity (OEO) Legal Services program, 1965-73, but increasingly they were under attack, especially from elected Republican officials like Governor Reagan and some City mayors and bosses, notably Mayor Daley of Chicago.

43. In 1972, Vice President Spiro Agnew criticized legal service attorneys like Plaintiff for being "ideological vigilantes" trying to change the economic system . See S. Agnew, "What's wrong with the legal services program," 58 *ABA Journal* 930-932  (Sept. 1972.)

44. Legal services opponents singled out for criticism a test case brought by MLS and Plaintiff to challenge the constitutionality of economic discrimination against poor children by Michigan in its statewide education rules and regulations  (1977-79.)  See H.S. Alim, "Critical Language Awareness in the United States," ERIC Reports.

45. That action  resulted in a decision on one count which required Martin Luther King, Jr., Elementary School of Ann Arbor, MI to take into account the black English dialect spoken by some children. The dialect previously had no recognized legal legitimacy.

46. The dialect was spoken at the school by poor black youngsters from an isolated segregated public scattered site Green Roads Housing Project in a middle class, racially integrated neighborhood.  Other blacks in the neighborhood did as well as whites.

47. Based on testimony from 8 sociolinguists and educators, the court ruled that educators should be taught to code-switch between the home/street language of those children and the English of the classroom. A defendant expert provided the training.

48. The decision increased in importance after a controversy about the teaching of Ebonics in Oakland, CA in 1996.   The concept was attacked by blacks as well as whites.

Relying on the Ann Arbor decision, sociolinguists defended the legitimacy of the dialect, but not as a separate language to be taught as such, which was the Ebonics approach.

49. In this century, the Ann Arbor case was featured in a PBS program *Do You Speak American?* which calls into question the idea that there is one English only, for the U.S. classroom, and all other variations are incorrect or inappropriate.

50. The Ann Arbor Black English case prompted a *Reader's Digest* attack on federally funded legal service attorneys being allowed to bring such test-case litigation. .

51. Critics seeking to close down the legal services program, notably Ronald Reagan, deplored the use of federal funds to raise issues, such as the aforementioned language controversy, which were devised by lawyers and organizers, not by clients.

52. But the U.S. Supreme Court gave a boost to such test case litigation in *re Primus*, 436 U.S. 412 (1978).

53. The Court distinguished between ambulance chasers and not-for-profit attorneys like an ACLU team which had solicited women who were being sterilized without consent.

54. Despite their ideological differences, Houseman, who supported Plaintiff's test case litigation approach at MLS, arranged for a federally funded event in Albuquerque, N.M., to explore issues of informed consent from, and meaningful access to, dependent populations among the poor—children, people said to be mentally disabled, individuals in mental hospitals, prisons and similar institutions, nursing homes, remote migrant worker camps, and isolated islands in the Pacific.

55. Plaintiff was the conference reporter in 1977. Based on that information, Plaintiff sought a grant to study the issues on the ground in North Carolina, and compare that state's approach with Michigan's. The comparison allowed Plaintiff to see which worked best.

56. Houseman had become director of the U.S. LSC Research Institute. He approved the $30,000 grant for the research to be done by Plaintiff in 1979-80.

57. **Plaintiff finished the research and submitted a 244-page treatise.**

The work, *Independent Advocacy: A Strategy for the Delivery of Effective Legal Services to Dependent People*, was extensively footnoted.

58. The treatise was published in 1981, with footnotes and text garbled. Then it was not distributed to the nation's legal services programs when the Reagan Administration cracked down on the LSC Research Institute.

59. Upon completing the fellowship, Plaintiff found himself effectively barred from returning to legal services.   In his absence, MLS attorneys let one of his client die. LSC denied him employment opportunities because he was an experienced attorney entitled to high pay.  **MLS and other programs favored young inexperienced cheaper attorneys to serve the poor.**

60. Plaintiff sued two legal services programs for age discrimination in employment, and settled with them.  Plaintiff's suit against MLS and Houseman's LSC's Research Institute was dismissed in Michigan.

61. Houseman already had left the Institute, to become director of the Center on Law And Social Policy (CLASP) until his retirement 32 years later in 2013. https://www.clasp.org/alan-houseman-honoring-32-years-leadership. **"When he joined CLASP in 1981, Alan led efforts to strengthen and preserve the Legal Services Corporation, which funds local legal services offices across the country to ensure low-income people have access to quality representation."**

62. Houseman still remains active as the recognized primary historian **of the legal services and legal aid programs in the United States.**

63. In 1983, Plaintiff briefly returned to Michigan for a jury trial commitment made  prior to his move to North Carolina.

64. During that trial, Plaintiff realized that he couldn't hear  some oral testimony and communication with the judge in that courtroom..

65. Plaintiff became eligible for a 20% military service compensation for that hearing loss which was first identified in 1960, while he was in the active army reserve after completion in Hawaii of his active duty. Plaintiff unconsciously ignored that hearing loss for more than 30 years.

### IIIA. The Michigan Bar's role in the conspiracy.

66. In 2000, John T. Berry was named executive director of the Michigan Bar.

67. Plaintiff was well known to Berry, because of the number of discipline actions which were brought against him on Berry's watch in the 20th Century in Florida.

68. Plaintiff became inactive in Michigan in 1983, when he lived in Connecticut. He moved to Winter Park, FL, in 1985; he became a Florida Bar member in 1987.

69. Plaintiff moved to Gainesville and has been at his current address since 1993.

70. Under Berry, in 2003, the Michigan Bar decided that inactive members should pay dues. Notices were mailed to inactive members' last known addresses. Inactive attorneys had been advised to notify the Bar of changes of address, but they were given no reason to believe that there might be financial consequences if they did not do so.

71. Plaintiff was unaware that he had been suspended for several years for failure to pay dues when he sought to appear *pro hac vice* for LeRoi Haskins in the 36th District Court in Detroit, 2006-2008. Haskins was suing Bloomfield Financial Group, which wrongfully garnished Haskins' federally exempt veterans' and social security benefits,

72. Plaintiff unsuccessfully sought to have the director of MLS introduce him. But she refused to do so without explanation, although Haskins was an eligible poor man.

73. On information and belief, MLS knew of Plaintiff's suspension but did not reveal it.

74. Bar member James Lumley moved for Plaintiff's admission, with full disclosure of Plaintiff's inactive state—but not of the then unknown suspension for failure to pay dues.

75. Judge Kenneth King, now 36th District chief, approved the motion. After two hearings, **Judge King found Haskins to be the prevailing party entitled to attorney fees.** Briefs as to the appropriate amount were submitted for both parties.

**76. The action went nowhere on appeal, but the attorney fees issue was never resolved by Judge King after briefing and it was not addressed in those further proceedings.**

77.  BLOOMFIELD FINANCIAL GROUP, LLC v. Haskins 789 NW 2d 439 - Mich: Supreme Court, 2010.

78.  BLOOMFIELD FINANCIAL GROUP, LLC v. Haskins, 794 NW 2d 599, 488 Mich. 1051 - Mich: Supreme Court, 2011.

79.  A Michigan Bar member—likely opposing counsel—learned of Plaintiff's suspension and informed both the Michigan and Florida Bars. Plaintiff responded to the satisfaction of each Bar and the grievances were resolved in his favor without further proceedings.

80. Janet Welch, Berry's successor, determined Plaintiff was eligible for Emeritus status in Michigan, which erased the issue of the dues arrearage.

81. The *Michigan Bar Journal* published a letter by Plaintiff, in its October 2011, issue, which drew a Bar response about the dues for inactive members.  https://www.michbar.org/file/journal/pdf/pdf4article1926.pdf.

82,  Another article on the topic by David Hornstein was published in December 2011 in the *Michigan Bar Journal.* https://www.michbar.org/file/journal/pdf/pdf4article1926.pdf

83,  Plaintiff detailed the wrongs done by Berry and the Michigan Bar.

84. They were amplified in the Hornstein letter which received no response from the Bar or anyone else. Hornstein wrote:

a. "I took inactive status in 1982, so I wouldn't waste money on bar dues. I moved several times since then. I was aware of the rule requiring the State Bar to be notified of my address changes but like many inactive members, I never bothered to do so, because being a lawyer was a thing of the past." (NOTE: Plaintiff remained an active litigator in other state and federal jurisdictions.)

b. "So it wasn't until August 2010, on a whim, that I looked myself up in the online directory. I didn't know if I would find a listing for me, and I was surprised to find myself listed as suspended for non-payment.

c. "I emailed the Bar and found that in 2003 the Michigan Supreme Court approved an asinine (sic) rule change which required inactive members to pay $217.59 a year.

d. "To require someone who isn't actually practicing law to pay dues is a rip-off making those Supreme Court justices who voted for the rules change, a gang of thieves in black robes .

e. "At the time of the rules change, the Bar still had an address and it was well past the time it could be forwarded to (Hornstein's) current address. That was the address to which the notice and a subsequent invoice were sent."

f. The writer chose emeritus status, as did Plaintiff. Hornstein found it "to be hilarious that I could be qualified for emeritus status."

g. The writer would not have qualified for emeritus status when the dues were imposed, but did so 20 years later, though he never practiced.

h. "Since then, I, like Plaintiff, have found a number of former colleagues, listed in the online directory as suspended for non-payment of dues. Most are around my age and are in all likelihood inactive."

i.  "Many are members who weren't notified of the rule change and are  eligible for emeritus status. While a mentally sound member of whatever status can notify the Bar of address changes it can't be done for those who are mentally incapacitated, and it's impossible for dead members to notify the Bar they have died."

j.  Hornstein noted that in 2011, the Bar's rule applicable to dues still affected nearly 4,000 members who are stigmatized as people "who are suspended for failure to pay dues," including mentally incapacitated or dead,

k.  In that light, consider the irreparable damage to the memory of the incapacitated or dead  by such suspensions.

l.  In its prior October response to Plaintiff, the Bar's anonymous writer added  to the hilarity. " 'Status unknown' is a temporary identifier for someone who was not  assigned P numbers or added to the Bar's electronic membership records in the early 1980's, because of incomplete information."

m. Plaintiff's example of such a person was Joseph (Joe) W.  Little. Little has been on the UF Law Faculty since 1967, but before he came to Florida, Joe actively practiced in Michigan for a year. Defendant Berry however knew Joe well and certainly knew  his  address.  Yet the Michigan Bar preferred not to list Little.  Imagine suspending Little for non-payment.

n.  The Bar continued: "Before hearing from (Plaintiff), **the Bar was unaware of the district court matter or any appeal from it:** further irrespective of the points (Plaintiff)  makes regarding the procedural elements of the matter, including there is no appealable judgment, or final order for review, the records indicate that the district  court ordered  the return of all garnished proceeds and the creditor's counsel represented in the Wayne County Circuit Court that all garnished amounts had been returned."

o. **No mention was made of the unresolved issue of fees.**

p.  Plaintiff and local counsel were entitled to receive fees **after both sides submitted briefs.  The only issue left unresolved was the amount of the fees, which would have been in the thousands, in light of the hours spent on Haskin's behalf by Plaintiff and Lumley.**

85. The *Michigan Bar Journal* published three other letters to the editor submitted by Plaintiff, in August 2015, http://www.michbar.org/file/barjournal/article/documents/pdf4article2683.pdf in September 2018, http://www.michbar.org/file/barjournal/article/documents/pdf4article3483.pdf and February 2020.

86. Plaintiff has been able to learn the third was published, only because his discussion of perceived indifference to, or hostility toward African-Americans, both in author selection, and publication content, appeared in the Michigan Bar's response to it,  See "Diverse &  Well Versed" by John R. Runyan, chair of the *Michigan Bar Journal* committee, published during the following month, in March 2020, http://www.michbar.org/file/barjournal/article/documents/pdf4article2683.pdf

87.    Plaintiff has little doubt his 2020 letter may appear as if it were always available, if and when the Bar responds to this complaint, but its absence is noted persistently during the last 2  months when he has been working on this pleading.

88. Plaintiff recently submitted a proposed article to the *Journal*.

a.  *The article was submitted* in December 2021, in response to the November 2021 issue which was devoted to Access to Justice in civil matters for the poor during the Bar's 100th anniversary.

b. Plaintiff's article advocated test case litigation as described *supra* and focused on omission of that approach in the previous issue. The November issue featured the following: none mentions test case litigation.

   c. *Commission goal: 100% access to civil justice system;*

   d. *Technology : the future of access to justice;*

   e. *Opportunity to increase access to justice;*

   f. *Limited-scope representation in Michigan.*

89. The issue opened with **a welcoming of all new attorneys and the evolution of our profession** from the incoming Bar president Dana Warnez, In bold letters, the article noted: "**I also encourage more experienced lawyers, like myself, to keep an open mind and share the innovation that may be coming along with our collective wisdom.**"

90. Michael Eidelbes introduced himself as the new *Journal* editor.

91. Eidelbes (Editor) wrote:

In this month's edition, we are tackling access to justice, as a cornerstone topic worthy of being featured in the issue marking the Bar Journal's 100th year. You will find articles dissecting what has been done and what can be done to make strides in the fundamental issue of justice with contributions from Michigan's leading experts, including two Supreme Court justices.

92. The next article considered why Michigan has a bar journal.

93. That was followed by *Building Toward a Breakthrough,* by Supreme Court Justice, the Hon. Bridget Mary McCormack.

94. Then came *1995 The State Access to Justice Campaign.*

95. With Angela Tripp, Supreme Court Justice Brian Zahra wrote: "Commission embraces goal of 100% access to civil justice system."

96.    After the article on technological advances, two authors provided "In Our Best Interest—History and opportunity to increase access to justice" about "Interest on Lawyer Accounts (IOLTA.)"  "In 1978 Florida became the first state to adopt IOLTA….The American Bar Association established its Commission on IOLTA in 1986."

97.    Contrary to the suggestion that IOLTA is a non-controversial project whose worth is assured, it has been litigated  several times.

98.    In each instance, the litigation was brought by attorneys who did not agree with their states' establishment of IOLTA accounts.

99.    Like the Michigan and Florida integrated Bars, the ABA likewise rejects positive mention of test case litigation to empower the poor.

100.    Years earlier, Plaintiff sued the ABA, for breach of contract.

101.    The ABA had accepted Plaintiff's submission but declined to set a publication date.  Plaintiff sued. See  *Kaimowitz v. American Bar Assn., et al,* 6:89-cv-00382-PCF (M.D. FL, Orlando Division, 1989.) A settlement was reached. [i]The article was published.   See Gabe  Kaimowitz, "The Legal Services Corporation Has Forgotten Its Mission," 17 *Hum. Rgts.* 41 (1990). Plaintiff had similar success *in settling Kaimowitz v. Duke L. J.,* 315 S.E.2d 82 (N.C. Ct. App. 1984.)  The journal reneged on a performance contract.

102.    In Michigan, it appeared the State Bar might be repeating the ABA strategy by holding Plaintiff's submission without publication.

103.    The Editor did not respond to the submission  of Plaintiff's article advocating and championing test case litigation until Plaintiff  in March 2022 wrote to find out whether it was received.

104.    The Editor acknowledged that it had been received and would be

considered by reviewers.  No timeline was suggested.

105.      Plaintiff wrote again in the summer and the Editor replied.
The reviewers' decision would be made known in August 2022.

106.      In August, the Editor notified Plaintiff that two unidentified
reviewers had rejected publication.  No reason was given.

107.      Plaintiff then observed that the *Journal* no longer seemed to be
publishing any letters to the editor.

108.      So Plaintiff submitted a letter to criticize an Anti-Semitic
overtone in commentary  about  the late U.S. Judge Avern Cohn.

109.      The letter has not been published.   The Editor has not
acknowledged its existence, even after  Plaintiff provided him with a draft of
this complaint.

110.      The 36th District Court in Detroit has not acknowledged
Plaintiff's  inquiry about the lack of decision on fees by Judge King.

**IIIB. The Florida Bar's role in this conspiracy.**

111. Plaintiff found himself blowing the whistle on racial harassment
by Orlando Florida police and legal establishment within weeks   after he
arrived there to direct Greater Orlando Areal Legal Services Inc. (GOALS,
now defunct.)  GOALS provided legal services to the poor.

112. Orlando secretly investigated the financing of GOALs with
the intent of cutting off the money source for the program, because of
Plaintiff's letters about the ongoing racism evident in local law enforcement
to U.S. Sen. Lawton Chiles (D-FL) and others, **G.** Blumenstyk, "Inquiry
targets legal clinic's funding, " *Orlando Sentinel*, Apr. 6 1986,

113. GOALS had an annual budget of $1 million, three offices,
with 11 Board members, a dozen attorneys, and a dozen more in staff support.
The historically white lawyers and staffers of color were in separate unions.

115. Cardwell, Florida Bankers' Association counsel, was partner and ultimately CEO of the state's largest law firm, Akerman.

116. In January 1988, the *Orlando Sentinel* in a feature about Cardwell credited him with writing an *amicus* brief which persuaded the U.S. Supreme Court in a 1984 decision to mandate a system of regional rather than national banking for the nation's future banking system.

117. Each state previously had its own banking system.

118. GOALS' major accomplishment in 1985 after Plaintiff became director was the seemingly successful threatened court challenges to the redlining practices of Florida, North Carolina, and Georgia lenders which were taking advantage of the new regional banking system by crossing state lines to acquire or merge with state banks in those jurisdictions.

119. In 1985, the *Atlanta Journal Constitution* won a Pulitzrt Prize for investigative reporting which exposed banks' "redlining" out black and poor neighborhoods from receiving any commercial loans regardless of the credit worthiness of individual or group borrowers in those areas.

120. In 1985, GOALS attorneys, and lawyers with several other federally funded agencies in Florida and North Carolina, got glowing headlines for persuading the new banks—First Union (now Wells Fargo), C&S and NCNB (now part of Bank of America)—to commit to investments of multi-millions in black and poor neighborhoods. Those areas had been redlined out of commercial loans and even home mortgages, the latter practice violative of the Home Mortgage Disclosure Act.

121. Cardwell stepped down as GOALS Board chair, effective Jan. 1, 1986, after he, for the Board, and Jay Rose, Esq., for the attorneys, negotiated a contract for the attorneys. Plaintiff was excluded.

122. In the summer of 1986, Plaintiff blew the whistle on the scam,

122. In the summer of 1986, Plaintiff blew the whistle on the scam,

123. Plaintiff forced Jay Rose and his GOALS attorney spouse to flee to Boston, after it was revealed the agreements with the lenders did nothing more than require the latter to promise good will in the future.

124. **After the revelation,** The Florida Bar selected Cardwell as its representative on the  Board, so that he could lead, with Ralph Armstead, a slumlord lawyer and new Board chair, the ouster of Plaintiff as GOALS director in the summer of 1986.  Cardwell resigned again, on Jan. 1, 1987.

125. Armstead responded to a Bar complaint filed against him by Plaintiff with one sentence: "(The Plaintiff) is a liar."  After 18 months and a change of investigating Bar attorneys, the organization found there was insufficient evidence to warrant action against Armstead.

126. Plaintiff reported the scam at the 1986 annual convention of the National Legal Aid & Defense Association (NLADA) in D.C.  The NLADA had arranged for panels to laud the accomplishments of the attorneys in Florida, Georgia and North Carolina who allegedly persuaded the bankers in those states to invest multi-millions in black and poor neighborhoods which previously were redlined to prevent eligible borrowers from getting loans.

127. Speaking for the NLADA, Houseman refused to allow Plaintiff's allegations of a scam to be raised.  He found Plaintiff no longer was to be regarded as credible, because of the ADEA complaints Plaintiff filed in 1980-81 against the LSC, MLS, and programs for North Carolina and Pittsburgh.

128. With regard to redlining, Plaintiff got  the ultimate satisfaction of filing an administrative  complaint with a federal agency to expose a First Union bank's redlining practice, and then appealing when the penalties imposed on the lender seemed insufficient compared to the harm done.

129. *Kaimowitz v. Bd. of  Gov., Fed. Res.*, 940 F.2d 610,(11th Cir, 1991),

129. The panel determined that Plaintiff lacked standing, because he suffered no harm; the federal agencies in fact enhanced his credibility when they penalized the lender, even though he was dissatisfied with the penalty.

130. Plaintiff also got a financial settlement from a First Union lender for refusing to finance mortgages for a qualified racially integrated developer and a dozen first time eligible home buyers.

131. See *Shiela Woods, et al., v. First Union Mtg.*, 6:89 CA 384 GKS (M.D. FL 1989).   Cardwell represented that First Union subsidiary.

132. Plaintiff continued to pursue the issue at his own expense.  See. *Attorneys Against American Apartheid v. Board of Governors*, No. 98-1483 (D.C. Cir., filed October 21, 1998). That was a petition for review of denial of reconsideration of a Board order dated August 17, 1998, approving the merger of NationsBank Corporation, Charlotte, North Carolina, and the BankAmerica. Corporation, San Francisco, California.

133. Plaintiff by then was a publicized critic of the Bar, Cardwell, and the white supremacy structure of the legal system  in Florida. Several reports in the *Miami Herald* described his dues fight against the Bar.

134. The Bar retaliated against Plaintiff after  the U.S. Court of Appeals for the 11th Circuit opened the door to the possibility that Plaintiff could practice in Florida federal courts on the basis of his New York license, without paying dues or appearing in the state courts in *Kaimowitz v. The Florida Bar*, 996 F.2d s*upra*.

135. That dictum is never cited by judges anywhere.   Plaintiff specifically raises that issue again here.

136. The Bar's hostility toward Plaintiff first was evidenced in 1994.

    a.  In that year, The Bar denied that Plaintiff was a member.

    `b.  The Bar thus misled Martindale Hubbell Legal Directory.

138. As a result, Plaintiff was deprived of opportunities for client referrals for nearly two years because of that error. The Bar said it didn't know how it happened.

139. Also in that year, the late U.S. Judge Maurice Paul found Plaintiff to be in contempt for persisting to seek the jurist's recusal.

    a.  Judge Paul barred him from appearing in the U.S. Court for the Northern District of Florida without approval of a Florida Bar member. He also barred Plaintiff from becoming a member of that Court.

    b.  In a hearing before Judge Paul, Plaintiff responded to the judge's threats against him:  "I know you have the power to do that and I'm not disputing that power.  And I stand here frightened. As frightened as I would have been in Germany in an earlier era.  As frightened as I would have been in the Soviet Union ... "

    c. Paul cut him off, saying: "If you make any more remarks like that,  you are going to have a reason to be frightened." W.D. Hinton, "The combustible crusader," the *Orlando Weekly*, July 5, 2000.

140. That error-filled  news report remains on the internet. Plaintiff's response was removed  after a year despite the assurance  from the publisher's Detroit law firm--Butzel Long—attorneys for the Ann Arbor School District in the Black English case--that the defamatory  article would be withdrawn when the publisher removed Plaintiff's whistle-blowing 1,500 word "letter" which was originally published in hard copy and on the internet.

141. The letter was an  expose of  a so-called non-existent Black Business District to be built with $7 million in federal funding, by Orlando and its mayor, in clear violation of the federal False Claims Act (FCA.)

142. Plaintiff brought an FCA action against Orlando and its mayor.

143. The assigned judge  in D.C. declined to dismiss the action.

144.  See *U.S. ex rel Attorneys Against American Apartheid v. City of Orlando*, June 4, 2001 (D. D.C. 2001), "Personal Jurisdiction and Venue," 23 *Taxpayers Against Fraud* (TAF(July 2001), p. 10.

145. Having moved to Gainesville, FL in 1992. Plaintiff no longer had meaningful access to a federal district after Judge Paul ruled without basis in law or fact that Plaintiff would be barred from submitting any papers in that jurisdiction without the signature of a Florida Bar member, even if he were suing the Bar.

146. Judge Paul cited nothing for his authority to bar Plaintiff's filing.

147. The jurist also effectively blocked Plaintiff's suit against the Florida Board of Regents (University of Florida) for age discrimination.

148. Plaintiff turned to the Florida state courts. In 1996, Plaintiff filed an action *pro se* against the Florida Bar in small claims court in Alachua County, FL for its erroneous denial of Plaintiff's membership in the organization in response to a *Martindale-Hubbell Directory* inquiry.

149. The Bar relied on five trial court judges, and the Clerks on every trial and appeals court level and two Florida Bar counsel, to resist the action by any means necessary until it was dismissed—**22 years later by John A. Tomasino (Tomasino), Supreme Court clerk..**

150.  In August 2018, in the 22nd year, Tomasino denied Plaintiff's application for a writ of *certiorari f*or clarification and ended the litigation. Plaintiff sought clarification about a dismissal of the action below.

151.  Plaintiff had not answered a First District Order. by its Clerk.

152. Plaintiff had been duly warned of a dismissal, if he did not do so. by Jon Wheeler, the Nam Lt. Col. AF (ret) Clerk for the First District. Wheeler had issued three such prior orders, **each on the same date**.

153. Plaintiff refiled that suit against the Florida Board of Regents.

a. Plaintiff refiled in 1996 in state circuit court.

b. That litigation against the Board (University of Florida [UF]) triggered an ongoing wheel and chain conspiracy in retaliation for Plaintiff's humiliation of a highly regarded celebrity Senior Judge Wallace Jopling who had been the fifth jurist assigned to that action in the Alachua County Circuit Court.

154. UF has key defenders for any action it takes--insofar as judges, justices, attorneys, including Bar leaders, are members of a unique Florida Blue Key (FBK) mostly legal fraternity. (Every FBK student chair was a law student, between 1923-2005, as have most if not all since then.)

155. The late Prof. Manning Dauer (FBK) supervised and reported on a Ph.D. dissertation done about FBK based on scores of interviews with its members who may be tapped while at UF or at any time as an Honorary member, if they have a UF connection.

a. The conclusion of the dissertation was that a statistically significant number of FBK members believe loyalty to UF to be paramount..

b. FBK admitted only white Christian males, and perhaps a Jew, during the first 50 years of its existence.

c. Every Democratic U.S. Senator and Governor since Gov. LeRoy Collins (D-FL) (1956-61), and several Republican elected officials, including U.S. Sen. Connie Mack, Charlie Christ and Jeb Bush, have been FBK members.

D. So have, among others relevant here, Justices Jorge Labarga, Peggy Quince, Barbara Parienti; attorney generals Pam Bondi and Ashley Moody, 11th Circuit Judges Susan Black and the late Peter Fay,

156. Judge Jopling and Stephen C. O'Connell, former Supreme Court Chief Justice and UF President (1967-71), were FBK chums (sic).

a, On their watch, the UF chapter split from the national. fraternity before World War II.

b. In 2000, when the *UF Independent Alligator* (*Alligato*r), published several articles about black opposition to honoring Justice O'Connell at an FBK an annual event, Judge Jopling was his only supporter.

c. . Judge Jopling said Justice O'Connell had been courageous when as UF president he ordered the arrest and expulsion of scores of black students and advisors after a sit-in on Black Thursday, Apr. 15, 1971.

d. Judge Jopling's support prompted Plaintiff to change his mind about a plea bargain he initially accepted in 2000.

e. Judge Jopling was a lifelong member of Trinity United Methodist Church, who became a justice of the peace in Columbia County after World War II, then school board attorney who defied the U.S. Department of Health, Education, and Welfare order to end the County's school desegregation, He was elected 3rd Judicial Circuit judge in 1977.

f. Columbia County had the reputation of being one of the three most entrenched anti-civil rights communities in Florida. See UF Political Science Prof. J.W. Button, *Blacks and Social Change: Impact of the Civil Rights Movement on Southern Communities* (2014).

g. Assigned to *Kaimowitz v. Board of Regents (UF), supra,* Judge Jopling refused to step aside despite the fact that his son John D. was representing the UF in another matter—a False Claims Act action brought by the Justice Department against the UF School of Medicine for overbilling and misrepresenting the status of Medicare patients.

h. Judge Jopling limited the topics Plaintiff could raise in deposition of Prof. David Colburn, UF Provost, acting UF President,

· i, Colburn also was chair of the UF state history department.

j. Plaintiff was present at a meeting of the UF historically white history department when they were considering Prof. Maxine Jones to be their first black member in 1994.

k. Those present discussed a directive from the State Legislature to avoid publication or other criticism of articles before and during the 1995 150th Celebration of Florida Statehood.

l. Plaintiff had reason to believe in 1993-94 that Colburn for that reason deliberately misled him and/or the University Press of Florida about two proposed books Plaintiff wanted published about 1) the *Fall & Rise of Segregation in a Southern Town* (Orlando) and 2) *Bleaching the News* (by the *Orlando Sentinel*.)

m. In 1993, a UF Press editor Alexandra Leader had arranged for Plaintiff to submit an outline and sample chapter for each., for review by two sources.  A decision would be made to publish either or both.

n. Plaintiff and his literary agent from Southfield, CT believed the books were more likely to be considered by a Florida publisher, after they had been praised but declined by publishers elsewhere as being too local.

o. Plaintiff and Colburn previously met through mutual friends. Colburn first offered to find out why UF Press had not responded for months, and he then sent a "smoking gun" letter to assure Plaintiff that the publisher would be glad to receive finished versions to decide whether to publish.

p.. Plaintiff scheduled March 1998 depositions for Colburn and Alexandra Leader. The Jacksonville lawyer claimed UF did not know where Leader was, and that Colburn's testimony should be limited to the age discrimination issue.  (Leader later returned to UF Press.)

q,. At deposition, in the presence of *Sun* reporter Ray Washington, Colburn's attorney objected to anything and everything.

r. The Jacksonville attorney reported to Judge Jopling that Plaintiff had abused Dr. Colburn. and violated the jurist's Order.

s. Judge Jopling charged Plaintiff with having committed 20 counts of direct and indirect criminal contempt, and directed the Florida Bar to pursue those same counts as well.

t. Plaintiff immediately filed a second complaint against the Florida Board of Regents (UF), and identified Colburn as a Defendant. The case was reassigned to Judge Jopling. Both were stayed.

u,. Chief Judge Cates asked Chief Justice Charles Kogan to appoint a judge to hear and resolve the contempt charges. Justice Kogan appointed a Miami-Dade County senior judge Michael "Mickey' Salmon.

v. Justice Kogan, and Judge Salmon were Jewish.

w. The Bar, through the Supreme Court and the Fifth District, appointed Mark Yerman, The Bar was represented by Ed Iturralde.

x. By November 2000, Judge Salmon got approval from everyone for a plea bargain which would result in Plaintiff's plea of guilty to one of nine remaining contempt charges, and dismissal of the rest, a fine of $250, and a written and oral apology to Judge Jopling.

y. Iturralde would recommend that Judge Yerman approve a similar settlement, with imposition of costs of $250, and an unpublished reprimand, without need for personal appearance by Plaintiff. That was accepted and approved by the Supreme Court.

z. Plaintiff also had Judge Salmon's assurance off the record that Judge Jopling would step down from the two cases against the UF.

aa. Sentencing was set for Dec. 1, 2000.

bb. In November, Judge Salmon suffered a heart attack.

cc. Sentencing was [postponed indefinitely.

157.  Judge Jopling did not step aside from the UF cases until Feb. 1, 2002.

a. His recusal did not admit bias.   Instead he attack Plaintiff..

b. Plaintiff, Kaimowitz, has unilaterally created, by egregiously disrespectful conduct toward the court and opposing counsel, a climate of hostility, and animosity, that makes it impracticable  for the undersigned judge to continue presiding in these cases.  It is a sad commentary on our legal-judicial system that a litigant, especially one who is a member of the Florida Bar, can create, entirely by his own misconduct, a situation requiring recusal of duly appointed judges. Such is the case here.  Based upon the above findings, the undersigned does hereby recuse himself from further preparticipation in these cases and requests the Chief Judge of the Eighth Judicial Circuit to appoint a new judge to hear and adjudicate same.

c.  Chief Judge Stan R. Morris appointed his former partner, Judge Larry Gibbs Turner, to preside in the consolidated UF cases.  Turner was assigned to other civil actions brought by Plaintiff against a Martin Luther King Commission of Florida, and most significantly, to a case against Alachua County's  Board of County Commissioners,

d, **Plaintiff and his former supervisor Lizzie Floyd Miles, were represented by Joe Little in that action against the County.**

e, Those cases were resolved on terms favorable to Plaintiff, for about $100,000, by August of 2002, in three mediations approved by Judge Turner.

f. Professor Little persuaded the County to place Miles in a new position at comparable pay, full back pay, retention of unemployment compensation, $25,000 damages, and $25,000 more in attorney fees.

**158.**    The contempt sentence still needed to be effected.  Judge Morris wrote to then Chief Justice Charles Wells, on May 25, 2002, to appoint a judge to replace Judge Salmon.  *Judge Morris' letter is critical to an understanding of the conspiracy which flowed thereafter under Judge Turner's direction, to avenge the humiliation of Judge Jopling;*

"As Chief Judge of the Eighth Judicial Circuit, I am asking you to assign a judge from outside the eighth circuit to preside at a contempt proceeding collateral to the lawsuits listed above (the two *Kaimowitz v. Board of Regents [UF] cases*)....I recently conducted a case management hearing and all parties are anxious to proceed with the underlying matter.  **I have assigned the underlying lawsuits to Judge Turner in our circuit's civil division**.

***I do believe it is appropriate to seek a separate jurist to handle the contempt.*** I do not think that a judge from the Eighth or Third Circuits would be appropriate.  Many of our judges have recused or excused themselves and Senior Judge Wallace Jopling of the third circuit who initiated the contempt by Rule to Show Cause based upon Mr. Kaimowitz's conduct in the underlying trial over which Judge Jopling was presiding.  He has now recused himself.  I would request you attend to this matter as soon as time may allow you." Sincerely, Stan R. Morris, chief judge.

159.   Then without waiting for the Supreme Court Chief Justice to make an

appointment, Judge Morris appointed Judge Turner to hear the contempt proceeding and refused to explain why he did so.  **The conspiracy was on!**

160. Those originally seeking to avenge Judge Jopling, starting in 2001, in addition to **Judges Morris** and **Turner** were his son, **John D.**, partner/CEO in the historically white insurance defense boutique law firm of Dell Graham; **Judge Toby S. Monaco**, a partner in that firm before he was elected to the bench; and other former partner of his-- **Judge Fredrick D. Smith and Judge Robert Cates;** former **City Attorney Marion Radson**, and his assistant **Dan Nee**, now City Attorney; **David Wagner**, former county attorney; **Buddy Irby**. former Clerk of the County Court of Alachua County; and his chief deputy **Grace Curtin**; former *Gainesville Sun* journalist, **Ray Washington**; generally the **Office of the State Attorney; and leadership of the 8th Judicial Circuit Bar Association** (EJCBA), a white supremacist organization which was started in 1941;  and Plaintiff's own attorney, UF Law Prof. **Joseph W. (Joe) Little**.

161. All except Irby and Curtin are Bar members.

162.   Judges Turner and Monaco also were salaried by Defendant UF as adjunct professors when they ruled against Plaintiff, (as was Little) in 2004,

163. Former Judges Turner and Monaco unethically exchanged files several times in 2004, so they could coordinate Judge Turner's *Sentence on Judgment of Guilty of Criminal Contempt,* on Nov, 16, 2004, with Judge Monaco's dismissal with prejudice, on Nov. 5, 2004. Judge Monaco dismissed with prejudice a 10 count complaint for false arrest by the City of Gainesville, and defamation by the *Gainesville Sun. See Kaimowitz v. City of Gainesville, et al.,* #01-2003-CA-2400 (FL 8th J.C. Alachua Co, Cir. Ct. 200*3). Judge Monaco did not hold a case management conference or allow discovery in that case or any of a half-dozen others involving Plaintiff. He rejected all motions for his recusal.*

164. Judge Turner attached Judge Monaco's decision among his examples of frivolous *pro se* actions by Plaintiff. Neither paid attention to Judge Monaco's *sua sponte* setting aside the dismissal, because he made errors in his citations, and so he held a hearing and modified the original. As a matter of law, the Order Turner attached had been voided.

165. The wrongdoing of Judges Turner and Monaco was so transparent that Plaintiff asked the Bar to pursue a grievance against Plaintiff to challenge their actions. The Bar filed 8 charges of misconduct and other wrongdoing by Plaintiff. On Nov. 1, 2005, the Bar committee which formed to consider the allegations found that under the circumstances **there was no probable cause to fault Plaintiff, and ordered dismissed,** *In the Matter of Gabe Kaimowitz,* **TFB 2004-00,363(13a).** The record was destroyed a year later.

166. The reckless disregard of the truth, and facts, by the conspirators and their allies, as well the hostility toward Plaintiff, because he is a secular Jewish whistle-blower, are evident in records and transcripts leading up to  Turner's S*entence* of Nov. 15, 2004, and every court proceeding involving Plaintiff and Judge Monaco thereafter;

167. Judge Monaco  listed his years of service and that of his lawyer wife to  United Trinity Methodist Church as reason to support his judicial candidacy,. in a 2000 article published in the *Gainesville Sun*.

168. In 2013-2014, when Judge Monaco was running the Church's lay council, and its executive committee, the Church placed E-sermons on the internet during the Lent season.  They identified Jews as the  killers solely responsible for his death after they excommunicated him.     Comments were invited.

169. Plaintiff offered his; no one responded.

170. Judge Monaco's bias against Plaintiff was made clear when he was a successor judge after  seven witnesses and 20 hours of testimony were recorded and numerous documents admitted while the assigned Judge Victor Hulslander presided, in *Erin Friedberg and Butterfly Education Project, LLC, v. City of Gainesville*, #01-2012-CA-360 (FL 8th J.C. Alachua Co. Cir. Ct. 2012).  Plaintiff represented both complainants.

171.  During the final hour of testimony, City witness Stephanie Marchman made a damaging admission, echoed by the Assistant City Attorney representing her.  Marchman had demanded $39,000 plus to search and redact the thousands of emails Fredberg sought to examine, because all of them had to be reviewed before they could be released.

172.  The City's attorneys relied entirely on Florida's Public Records Act, §119.1 et seq.  Neither knew that the principal authority for resolution of public record disputes lies in Art I., §24a, Florida Constitution of 1968 as amended.

173.  Judge Hulslander immediately adjourned the hearing until the following day when he promptly recused himself, because he suddenly found he could no longer tolerate Plaintiff's criticisms of him.  C. Curry, **Judge recuses himself, cites attorney's emails**, *Gainesville Sun*, July 24, 2002.

174,.  Named successor over objection, Judge Monaco immediately dismissed the claims of Plaintiff Butterly Education Project, and motions for his recusal.

175.   Judge Monaco claimed case law allowed him to continue, even though he conceded being biased against Plaintiff.

176.   Monaco excluded all the previous testimony and numerous documents which had been admitted, without giving the parties opportunity to maintain that record.  He dismissed the co-plaintiff's amended complaint with prejudice, denied Plaintiff the right to appear at a videotaped deposition of the City Attorney or at trial, because Gainesville falsely claimed he might be called as a witness,; ignored a constitutional question which had been contained in the Butterfly Education Project's intervention papers, gave Friedberg a three-hour bench trial, and granted judgment for Defendants

177. Further evidence of Florida Bar member wrongdoing  can be found in:

a. Every one of the actions involving Judge Monaco and former Judge Monica Brasington;

b.  *Gabe Kaimowitz v. Supervisor of Elections et al*,  1-16-cv-00257-MW/GRJ (N.D. FL 2016), and the appeal, therefrom;

e. Every appeal and petition to the First District Court of Appeal, which has been resolved in the main without hearing or briefing, primarily by procedural orders issued by the present and former Clerks of the Court Jon Whelan, and  his successor Kristina Samuel, respectively; both are Florida Bar members;

d,  Every appeal and petition to the Florida Supreme Court which has been resolved in the main by John A Tomasino, its Clerk since 2013;

e. The record in *Florida Bar v. Kaimowitz*, 13-SC-754 (2015);

f. The record of every action since 2013 involving Kaimowitz and Tomasino.

g. The refusal of Jesse Irby, a Bar member, to file or docket any papers submitted by Plaintiff since June 1, 2022;

h. The Index for Gabe Kaimowitz and Liz Miles v. Bd. of County  Comm'rs, n and for Alachua County, #01-2002-CA-1969 (FL 8th J.C. Alachua Co. Cir. Ct. 2002).

i. A repetitious erroneous cite in *FL Bar v. Kaimowitz* 168 So.2d 230 (2015.)

178. Under color of law, the City of Gainesville, its former and current City attorneys in furtherance of the conspiracy on Dec. 7. 2017. blocked Plaintiff's successful promotion of the municipality as the first Butterfly City in the nation, 2008-17.

179. To make that Butterfly Coty endeavor a success, Plaintiff successfully pursued an A.A. in graphic design, and a B.A, *magna cum laude* from DeVry University on-line, 2009-2013.   Plaintiff was funded by the Veterans' Administration (VA.)

180. From 2007-2017, Plaintiff coordinated a group which successfully persuaded the City of Gainesville, to unanimously accept their recommendations to promote the municipality as the First Butterfly City in the nation.  The group created a website, developed a logo, and received national and international recognition.  Gainesville actively promoted Butterfly City. Eleven gateways to Gainesville displayed the Butterfly City logo.

181. City Attorney Radson publicly committed to trademarking the logo in December 2008, but he and his successor reneged because of the conspiracy. They also refused frequently to provide public records to Plaintiff.

182. On Dec. 7, 2017, Lauren Poe, mayor, and Commissioner Harvey Ward, his successor, *sua sponte* during the time for citizen comments in an empty auditorium, called for a vote to remove the signs and all vestiges of Butterfly City without reason. Without discussion, the motion was approved 5-2, by the white Christian majority.                    ]

183. In 2019, the same mayor and Commissioners refused to reconsider although Hull, England the first Butterfly City in Europe had agreed to become a sister city.

184. Plaintiff thereafter ran in every at large election as a single issue candidate to have Gainesville identified as a Butterfly City again.

185.. In July 2016, Plaintiff sought to retire from the Florida Bar.  The Bar Retirement Rule is very clear and takes into account any disciplinary action in effect against an applicant seeking to retire.  His retirement was approved effective Aug. 15, 2016, by three letters from the Bar director, in September and October 2016, and an affidavit from the Bar membership committee.

**Rules Regulating The Florida Bar**

**RULE 1-3.5 RETIREMENT**

Any member of The Florida Bar may retire from The Florida Bar upon petition or other written request to, and approval of, the executive director. A retired member shall not practice law in this state except upon petition for reinstatement to, and approval of, the executive director; the payment of all membership fees, costs, or other amounts owed to The Florida Bar; and the completion of all outstanding continuing legal education or basic skills course requirements. A member who seeks and is approved to permanently retire shall not be eligible for reinstatement or readmission. A retired member shall be entitled to receive such other privileges as the board of governors may authorize.

A retired member shall remain subject to disciplinary action for acts committed before the effective date of retirement. Acts committed after retirement may be considered in evaluating the member's fitness to resume the practice of law in Florida as elsewhere stated in these Rules Regulating The Florida Bar.

If the executive director is in doubt as to disposition of a petition, the executive director may refer the petition to the board of governors for its action. Action of the executive director or board of governors denying a petition for retirement or reinstatement from retirement may be reviewed upon petition to the Supreme Court of Florida.

186.  In September, 2016, Plaintiff filed a motion to appear as next friend, or if approved, as a counsel for Marie Henry in her litigation  in the U.S. Court for the Middle District of Florida.  Henry, a black single mother from St. Croix, sued the Florida Bar to block its demand that she be approved by a physician chosen by the organization before she could return to practice. Henry had contacted Plaintiff..

187.    Plaintiff did so to raise the issue of whether he could appear in federal court on the basis of his New York license although he was retired from the Florida Bar.

188. Plaintiff has been a member in the Middle District since 1987,  It provided Plaintiff with a basis to challenge a disciplinary action taken by the Florida Bar.  In the provision, Plaintiff is required to and he did notify in writing the U.S. Attorney for the Middle District of Florida, so that he could be heard.

**RULE 2.04   DISCIPLINE**

(a)    Any member of the bar of this Court, admitted generally under Rule 2.01 or specially under Rule 2.02, may, after hearing and for good cause shown, be disbarred, suspended, reprimanded or subjected to such other discipline as the Court may deem proper.

(b)    Whenever it appears to the Court that any member of its bar, admitted generally under Rule 2.01 or then appearing specially under Rule 2.02, has been disbarred or suspended from practice by the Supreme Court of Florida, or by any other court of competent jurisdiction, as the case might be, or has been disbarred on consent or resigned from the bar of any other court while an investigation into allegations of misconduct is pending, or has been convicted of a felony in any court, such disbarment, suspension, resignation, or conviction shall, twenty-one (21) days thereafter, operate as an automatic suspension of such attorney's right to practice in this Court; provided, however, that the attorney may file, within such twenty-one (21) day period, a petition, with a copy served upon the United States Attorney, seeking relief from the operation of this rule, and if a timely petition is filed, suspension shall be stayed until the petition is determined.  If such petition is filed by an attorney who has been admitted to practice generally under Rule 2.01 of these rules, it shall be heard and determined by the Chief Judge of the Court sitting with any two or more of other judges of the District as the Chief Judge shall designate.  If such petition is filed by an attorney who has been admitted to practice specially under Rule 2.02 of these rules, it shall be heard and determined by the judge assigned to the case in which such special appearance has been made.

189,  U.S. Judge Carlos Mendoza who was presiding in the *Henry* matter was informed  that Plaintiff had been suspended by the Florida Bar and refused on that basis to consider any papers submitted by Plaintiff.

190.  Judge Mendoza, a Bar member, referred the application to Bar member Magistrate Karla Spalding, a one-time shareholder in Cardwell's Akerman firm.

191 Magistrate Spalding, a Bar member, rejected all filings by Plaintiff.

192.. The district court action was affirmed by 11th Circuit Judge Adalberto Jordan, who had been honored by the Florida Bar recently.  Case law on point was ignored.

193.   Notwithstanding the Bar approval of retirement,  J. K. Fisher, a Bar counsel, filed a motion with Clerk Tomasino to have Plaintiff show cause why he shouldn't be disciplined for filing papers in the Orlando federal court.  **Fisher sought to have a one-day trial on the matter in Gainesville, in Alachua County.**

194.  On Feb. 3, 2017, Fisher was quoted in the *Gainesville Sun*: "'No matter how the respondent (Plaintiff) twists his status, The Florida Bar had no authority to remove, lift or stay (Kaimowitz)  suspension by the Florida Supreme Court."

195. Accepting Fisher's complaint, Clerk Tomasino demanded that Plaintiff show cause within 10 days why he should not be disciplined.

a. To allow Plaintiff to answer, Tomasino said he would waive a requirement he claimed was imposed by the Court in the suspension proceeding, (at his request) to require a signature of a Bar member in good standing for any document Plaintiff filed.

b. Tomasino cited *Florida Bar v. Gabe Kaimowitz*, 168 So.3d 230 (2015).

c. Tomasino cited that decision again when he struck Plaintiff's demand for a rehearing of the disbarment imposed by the Clerk on Dec. 1, 2016.

d. Tomasino not only cited the decision a third time when Plaintiff filed a petition for *certiorari* with the requisite filing fee to pursue dismissal by the First District Court of Appeal of that small claim against the Bar.  See discussion *supra* of that odyssey. Tomasino also returned that document *and the check*, based on that 168 So.3d 230 citation.

e. Plaintiff's application also was docketed in the First District files, so Tomasino accepted both application and check when they were resubmitted.

**f. That reported decision makes no mention of any such requirement.**

g. Tomasino had imposed the condition in the suspension proceeding.

h. Plaintiff complied, and Tomasino included that attorney's name in the docket report, so that anyone else supporting Plaintiff could expect the same exposure.

i. Tomasino had forgotten to include that directive in the suspension order which was submitted for publication to West Publishing.

j. Other Florida Bar disciplinary opinions in that volume and at least one other volume of reported disciplinary decisions had similar omissions.

k. Tomasino in his Show Cause Order, gave Fisher 10 days to reply.

L. But what about Fisher's contention that a one-day trial was needed before the Florid Supreme Court (Tomasino) could resolve the show cause issue?

m. Within a few days of Plaintiff's authorized response, Tomasino entered a one page disbarment based solely on Fisher's application (whatever that was), without a hearing or even a reply from Fisher.

n. Six of the seven justices' names were included. The seventh, Justice James Perry, the Court's only black male, disqualified himself without reason or known basis.

p. Tomasino has been given virtual control of the disciplinary process. Judges are required to comply with his manual when they are assigned as referees.

q. Tomasino has waived those requirements when they favored Plaintiff.

r. For instance, referees recommending suspension was required to provide a list of all documents, and an index of proceedings. Referees are required to do so. so that the parties and their attorneys will have a citable record for their briefs. On the first page of the referee's recommendations, to suspend Plaintiff, the jurist stated that the exhibits were too numerous to be identified and that he did not have his clerk available so he took no notes during the hearing. The recommendations were factually erroneous throughout.

s. Tomasino also has imposed a requirement that an attorney being

disciplined must provide the full transcript of any and all hearings before their brief will be considered.  Tomasino so notified Plaintiff **after** Plaintiff submitted his brief.

t. Tomasino requested that Plaintiff remove him from e-mail Posts critical of him and the Court.  Plaintiff refused with explanation.  Tomasino did not respond.`

196. Tomasino has been given that authority because seven justices are required to review disciplinary actions arising from  alleged bad behavior among more than 100,000 Bar members.  The system requiring all seven justices was established at the outset, in 1950 when the Bar had only a few thousand members.   (Michigan has only 45,000).

197.   The link of Tomasino, and Berry, e.g., was provided in an  Appendix submitted to the Florida Supreme Court, to persuade that tribunal to consider the saga of the then 22 year old small claim originally filed against the Florida Bar. https://efactssc-public.flcourts.org/CaseDocuments/2018/159/2018-159_Motion_115863_RC01P.pdf

198. *The Florida Bar News and Journal* editors for the first time rejected a submission by Plaintiff in March 2016, after publishing more than two dozen since 1988.

a. The submission was a response to a defamatory error-filled attack on Plaintiff personally by representatives of the Florida Cuban American Bar Association.

b. The *News* previously published Plaintiff's whistle-blowing about a claimed successful collaboration 40 years earlier  by the Bar and the University of Florida School of Law program to facilitate the entry of Cuban exiles into the Bar.

c. They had been lawyers in Cuba, but differences in  the systems and language were barriers to their entry into the Florida Bar.

d. Plaintiff noted that a similar program had been successful in Miami.

e. The writers claimed a need for more Spanish-speaking Cuban lawyers.`

f. A subsequent letter by a Puerto Rican lawyer noted that there were many Spanish-speaking attorneys in the Miami area, although they were not Cuban.

g, Plaintiff's submission also challenged  favoritism shown to the anti-Castro

Cubans by the Bar since the 1990s.

h,. Plaintiff earlier had forced the Bar to admit that a publicized visit of members to Cuba, many of whom had been in families who fled the Castro regime, was not actually sponsored by the organization or its international section.  Plaintiff previously had demanded a pro rata rebate of his dues which were used to fund a 1994 Continuing Legal Education (CLE) course and text book which conjectured how justice could be restored in Cuba after Castro was overthrown.                     ``

i. The Bar rejected the application.  The course was educational, not political.

199.The most recent denials by the conspirators of meaningful access to the courts in Florida for Plaintiff and to its publications came in the judicial response to three small claims filed by Plaintiff in Alachua County (Gainesville) in 2021.

200. Two were assigned to Judge Kristine Viorst, the third to Judge Meshon Rawls.

201.  In 2022, Judge Viorst stepped away from those cases without explanation.

202.. Chief Judge Mark W. Moseley assigned Grace Curtin's husband, Aymer, now a senior judge, as Judge Viorst's successor in both cases..

203. Judge Moseley also assigned Senior Judge Curtin to the third small claims action, even though to this day, Judge Meshon Rawls has not stepped aside.

204. Judge Moseley and Plaintiff had one previous publicized encounter.

205. Judge Moseley persuaded Plaintiff to withdraw a motion, which objected  to the shackling of a 90 pound black teenager who was charged with a property offense, by suggesting a harsh sentence for the youth if the motion were denied.. C. Swirko, "Test case on  shackling juveniles withdrawn," *Gainesville Sun*, Nov. 26, 2009.

206,. Plaintiff also unsuccessfully sought the recusal of Judge Moseley earlier in the ongoing small claims saga against the Florida Bar which was started in 1996.

207,. Judge Moseley also has been pastor of First Church of Christ in High Springs, FL since he first arrived in the Gainesville area decades earlier.

a. Several of his sermons were visible on the internet, and may still be.

b. Pastor Moseley makes clear his view which suggests that no one will enter the Kingdom of Heaven without a belief in Jesus.

c. His antipathy toward secular Jews like Plaintiff is evident in his sermons which fault Jews in particular for the death of Christ, e.g., direction to Paul, a disciple to take revenge on the Jews who were responsible for the Lord's crucifixion.

d. Plaintiff had experienced similar fervor from Judge Monaco.

e, Several of these experiences with that jurist have been discussed, *supra.,*

f. When Plaintiff in response to that jurist's request at a hearing in 2006, objected to an annual display of a Christmas tree with religious symbols in the waiting area for hearings in Judge Monaco's chambers, and identified Judge Monaco's Jewish neighbor who had similar feelings about the display being inappropriate, Judge Monaco ended the hearing, dismissed the action and directed his protégé at the historically white Dell Graham, P.A. John D. Jopling, Esq. to file for attorney fees.

g. John D., representing the Defendant, applied for more than $100,000 in fees. But when Plaintiff demanded a hearing to respond, the case was closed.

h. Judge Monaco now is president for Trinity United Methodist Foundation.

i. Plaintiff was suspended for two years for including those facts in documents filed in *Friedberg et al. v. Gainesville,* #01-2012-CA-360 9FL 8TH J,C, 2012.0

j. That historically white Church is regarded as one of the two major churches in Gainesville, which are influential in local political and economic decision-making.

k. Trinity Church member Ed Braddy was mayor of Gainesville, 2011-2016 who applauded the aforementioned anti-Semitic E-sermons publicly. Jon Mills, former partner of Judge Monaco, was former House Speaker and UF Law School Dean.

l.. The other historically white political powerhouse is Holy Trinity

Episcopal Church.  John D. and former City attorney Marion Radson have been vestry members and members of the Church's Foundation.

m.  Mayor Ward was secretary for the Church.  David Colburn was executive director of the Foundation for years.

208. Judge Moseley's unstated reason for the selection of Grace Curtin's husband to preside over the small claims cases became obvious.

209. `Mandated mediation in small claims cases was ignored. Judge Curtin dismissed each of the three on Apr. 1, 2022.

210 . Judge Curtin was the ideal choice for the task.  In 1996, in *Kaimowitz v. Florida Bar, supra*, Judge Curtin granted a telephone appearance by Florida Bar counsel, and accepted his argument that the organization could only be tried in Leon County, in Tallahassee where its central office was located, before Plaintiff arrived on time.

211.  Judge Curtin ruled Plaintiff would have to refile in Levy County.  Plaintiff timely moved to set aside the dismissal.  Judge Curtin ignored that motion.  That became the small claim which required more than 21 years to resolve.

212.  In 2015, Judge Curtin's wife Grace tried unsuccessfully to persuade Judge Thomas Jaworski not to hear Plaintiff, because  her husband had dismissed the action years earlier.  After hearing Plaintiff and the Florida Bar, Judge Jaworski allowed Plaintiff to proceed. But the jurist cancelled when Bar counsel smeared Plaintiff in a document.

213.  In entering the dismissals on Apr. 1, 2022, Judge Curtin relied on a citation to Judge Turner's 2004 *Sentence* as the basis for each.  The judge had received a copy of Judge Turner's *Sentence* in 2004 when it was circulated to every jurist and clerk in the 8th Judicial Circuit, even though Judges Turner and Curtin were retiring on Jan. 1, 2005.

214.  Judge Curtin referred to Judge Turner's *Sentence* in vague terms in 2022.

215. Relying on a faulty memory, Judge Curtin barred Plaintiff from representing Butterfly City on two of the claims. In fact, the *Sentence* specifically allowed Plaintiff, then a Florida Bar member in good standing, to represent clients, presumably including his one-person corporation.

216. A person and his one-person corporation are regarded as two separate entities,

217. Each is entitled to due process of law.

218. In the action in which Judge Curtin allegedly replaced Judge Rawls, he ruled that the Clerk Jesse Irby should accept no further documents from Plaintiff and the Clerk would be liable if he did so.

219. Clerk Jesse Irby, a Bar member, returned papers in all three cases based on that ruling, although Judge Curtin did not include the directive in either of the other two. He entered one of those two specifically as being dismissed without prejudice.

220. In fact, Judge Curtin rightly identified Irby as a defendant, in that dismissal..

221. Clerk Jesse Irby's most recent rejection and return without docketing was of a motion for a voluntary order of dismissal of the *Alligator*, the other party originally identified in that small claims action in which Jesse Irby is named as a defendant.

222. The *Alligator* in 2020 breached a contract to publish a political ad submitted by Plaintiff but in 2022, they reached an agreement about publication, when Plaintiff again ran for local office. So Plaintiff was submitting a voluntary order of dismissal with prejudice as part of that negotiated settlement, which the Clerk refused to file.

223. Judge Curtin dismissals' were negated as a matter of law, because Plaintiff had filed amended statements of claims filed more than 30 days earlier. Further, Judge Curtin had ruled without resolving motions for his recusal, contrary to Florida law requirements.

224. Plaintiff sought relief in each by petition for mandamus to order the First District Court of Appeal to direct Clerk Irby to file and docket documents as the elected official is required to do by the state constitution and applicable case law.

225.  Since 2003 the Appeals clerks had not allowed a single one of 13 appeals or petitions submitted by Plaintiff for himself or others` to be considered by a panel.

226.  The appellate Clerk ignored the demand for Clerk Irby to file and docket papers.  The Clerk eventually dismissed all three, because of a case she cited which barred corporations from appearing without an attorney—which she and subsequently the panel she identified which repeated her ruling—stated had to be a Bar member.

227.  The small claims court rule allows any attorney to appear for a corporation.

228..  In the small claim of *Gabe Kaimowitz v. Jesse Irby*, he is the only plaintiff-appellant.    The Clerk dismissed that also on procedural grounds.

229.  Aside from those original motions to dismiss, no counsel for the defendants in those small claims court cases has filed any document.  The Bar member Clerks have pulled the weight for the Florida judicial legal system to deny Plaintiff's access.

230.  Before the First DCA dismissals were entered, Plaintiff filed a petition for writ of mandamus with the Tomasino and the Florida Supreme Court to order the First District Court of Appeal to require Irby to file and docket Plaintiff's submissions.

231.  On Apr. 21, 2023, Tomasino consolidated the cases.

232.  In June 2023, Plaintiff emailed a supplement to Tomasino and the attorneys involved, and mailed it for next day delivery to the Supreme Court.

233.  Not wishing to docket the supplement, Tomasino immediately dismissed the petitions: 1)  this Court generally will not consider the repetitive petitions of persons who have abused  the processes of the lower courts, such that they have been barred from filing certain actions there, and 2) the petition(s) had to be filed by a licensed Bar member.

## IV. Relief

234.  Incorporating Points 1 through 233  Plaintiff, as a whistle-blowing secular Jew known for decades for his legal representation of people of color,  asks this Court to find that Defendants and their members jointly and/or severely have violated rights guaranteed to him under the First, Fifth and Fourteenth Amendments to the U.S. Constitution.

235.  Incorporating, Points 1 through 234, Plaintiff avers those rights are enforceable under 42 U.S.C. §§1982, 1983 and 1985(3),

236.  Incorporating Points 1 through 235, Plaintiff seeks to enjoin Defendant Michigan Bar and its members from 1) continuing to refuse to publish an article submitted to its *Journal* in December 2021, which challenges that Defendant's published belief that the goal of individual legal representation for every eligible poor in civil litigation is the only and/or the preferred form of obtaining justice for them, and 2) continuing to refuse to publish a letter to the editor to challenge the published derogation of Judge Avern Cohn.

237.  Incorporating Points 1 through 236, Plaintiff seeks to enjoin Defendant Florida Bar and its members from continuing to claim that he is disbarred from practice in that state, and from denying that he is lawfully retired from practice in that jurisdiction.

238. Incorporating Points 1 through 237, Plaintiff seeks to enjoin Defendant Michigan Bar and its members from continuing to deny him meaningful access to the Michigan Courts to obtain fees as an attorney for the prevailing party in *LeRoi Haskins v. Bloomfield Financial* Group, in the 36th District Court of Michigan.

239.  Incorporating Points 1 through 238, Plaintiff seeks to enjoin the Florida Bar and its members from continuing to deny him meaningful access to the Florida courts by refusing to allow him to submit documents for filing and docketing in the Alachua County Courts, in pursuit of relief in three small claims actions started by him in 2021, and any new proceeding he might initiate in that jurisdiction and venue.

240. Incorporating Points 1 through 239, Plaintiff seeks a declaration that he is entitled to appear in federal trial and appeals courts to which he has been admitted in Michigan and Florida based on his New York license to practice.

241. Incorporating Points 1 through 240, Plaintiff seeks an injunction to prevent the Florida Bar and its members from continuing to refuse to publish a letter challenging the defamatory assertions made about him by officers of a Cuban-American lawyers association in its *Florida Bar News*.

242. Incorporating Points 1 through 241, Plaintiff seeks a declaration that he has been denied meaningful access to Michigan and Florida courts and Bar members

243. Incorporating Points 1 through 242, Plaintiff seeks a declaration that the Defendants jointly and severely in both states conspired in violation of the law and this attorney's rights, with and through John T. Berry, former discipline counsel for the Florida Bar, both before and after he called for imposition of dues on inactive members as that Bar's director, without affording them meaningful opportunity to be heard.

244. Incorporating Points 1 through 243, Plaintiff seeks damages of no less than $100,000 from the Defendant Berry, for his role in taking the actions which have led to the intentional destruction of the professional reputation of this attorney and loss of economic opportunity in both jurisdictions by unwarranted retaliatory disciplinary actions including an unwarranted Michigan suspension for failing to pay dues as an inactive member.

245. Incorporating Points 1 through 244, Plaintiff seeks a declaration that he unlawfully has been denied meaningful access to the courts and Bar publications of both the Michigan and Florida Bars,  by member judges and lawyers in both jurisdictions who conspired unlawfully to deprive him of his constitutional and federal rights.

246. Additionally,  Plaintiff seeks a jury trial and recovery of costs, plus legal interest, and fees, should he require retention of counsel.

### V. Certification

Under Federal Rules of Civil Procedure, by signing below, Plaintiff certifies to the best of his knowledge, information and belief, that this complaint (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or  by a nonfrivolous argument, for extending, modifying or reversing existing law; (3) the factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, and (4) the complaint otherwise complies with the requirements of Rule 11.

*Dated: Oct. 11, 2023.*

*/s/Gabriel H. Kaimowitz,*

GABRIEL H. KAIMOWITZ, Esq., 4411 S.W. 34th St., #1305, Gainesville, FL 32608,

(352) 375-2670 (Susan answers so Plaintiff can adjust hearing amplification)

      Plaintiff agrees to provide the Clerk's Office with any changes to his address, where case-related papers may be served. He understands that any failure to keep a current address on file with the Clerk's office may result in a dismissal of the case.

**From: Gabriel (Gabe) Hillel Kaimowitz, Esq. (MI P15654)**
4411 S.W. 34th Street, Condo #1305, Gainesville, FL 32608
(352) 375-2670 gabrielhillel@gmail.com

**Date: October 20, 2023**

**To: Clerk of Court,**
U.S. District Court for the Eastern District of Michigan,
Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd.,
Room 599, Detroit, MI 48226  (313) 234-5000

The cover letter below with the Complaint, Cover Sheet and a check for $402 previously was received by Bob at Inside Delivery at 9:30 a.m. Thursday, Oct. 12, 2023.  Thereafter, until Wednesday, Oct. 18,, I was advised to call back the next day, that such delay was not unusual.  On Thursday, Oc. 18, I provided the answering clerk and a supervisor (Kim), with UPS tracking information.  See attached.  Kim and Clerks assured me that there was no way to determine how the package could have been mislaid between the mail delivery at the U.S. Marshal's office and the Clerk, and declined to give me a number I could reach at that location.   I have been informed that the only way I can get assurance of any delivery is by certified mail, USPS.  This package with complaint, civil covwer sheet, and second check, is being sent that way.

Further, I believe this action by a Michigan Bar member emeritus against the Michigan Bar and others is politically sensitive, because one or more persons with knowledge of the processing of these papers is a member of the Defendant Michigan Bar, and that the pleading itself has immediate connotations of likely wrongdoing by the Defendant(s). With this explanatory note, the other papers and the amount of the check are identical to those received in Detroit on Oct. 12.

To the Clerk:

Please find, enclosed, a civil rights complaint, a check for the filing fee of $402, and a civil cover sheet.   No preliminary relief is requested at this time, though injunctive  relief is sought, along with declaratory relief and damages. The Michigan Bar is a defendant in this action. Are U.S. judges in Michigan required to be members of that Bar?  Is it a matter of choice?  If so, please let me know if the judge assigned to this action is a Michigan Bar member.

Bear with me.  I haven't been in the Eastern District of Michigan for 40 years, though in the past, I have found the jurists here to be receptive to innovative litigation.  I hope that is still the case.

See, e.g., *Martin Luther King, Jr., Elementary School Children v. Ann Arbor School District*, 473 F. Supp. 1371 (E.D. MI 1979)(school district required to take into account the Black English dialect spoken by plaintiff children in their public school instruction); *Annette Bell, et al., v. Wayne Co. Gen. Hospital*, 384 F. Supp. 1085 (E.D./W.D. MI 1974)(Three judge court declared Michigan Mental Health Code to be unconstitutional in material respects, and *Human Rights Party of Ann Arbor v. Secretary of State*, 370 F. Supp. 921 (E.D. Mi 1973.)(Three judge panel rejected application of a 15-year-old to be a candidate for the Ann Arbor School Board.)

I will call before the end of the week, to learn which judge has been assigned to this action, and the case number, so that I can ask the three defendants if they will waive service of process. Also, I may require an accommodation under the Americans with Disabilities Act.   I am a U.S. Army veteran with limited mobility who receives compensation for a hearing loss,. I would hope some proceedings may go forward by ZOOM. I am actively seeking local counsel. Thank you in advance for the consideration I trust you will give this.

/s/Gabriel Hillel Kaimowitz,

Sincerely,                Gabriel Hillel Kaimowitz, Esq
Enclosures

# Proof of Delivery

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

**Tracking Number**
1ZA4W0390107678065

**Weight**
0.40 LBS

**Service**
UPS Next Day Air®

**Shipped / Billed On**
10/12/2023

**Delivered On**
10/12/2023 9:30 A.M.

**Delivered To**
DETROIT, MI, US

**Received By**
BOB

**Left At**
Inside Delivery

Please print for your records as photo and details are only available for a limited time.

Sincerely,

UPS

Tracking results provided by UPS: 10/18/2023 3:37 P.M. EST

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gabriel Hillel Kaimowitz Esq

## DEFENDANTS

The Michigan Bar, The Florida Bar, and John T. Berry

**(b)** County of Residence of First Listed Plaintiff  Alachua Co. FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Ingham Co. MI
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

4411 S.W. 34th St., #1305, Gainesville, FL 32608
(352) 375-2670  gabrieihillel@gmail.com

Attorneys *(If Known)*

Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / Product Liability | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 367 Health Care/ | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' / Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 340 Marine | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | **LABOR** | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| | | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | **IMMIGRATION** | |
| | | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | |
| | | [ ] 555 Prison Condition | [ ] 465 Other Immigration Actions | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | |
| | | [ ] 790 Other Labor Litigation | | |
| | | [ ] 791 Employee Retirement Income Security Act | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1982, 1983, 1985(3), 28 USC 2201, 2202

Brief description of cause:
Defendants have conspired to deprive Plaintiff of his property rights guaranteed by the First, Fifth, and Fourteenth Amendments to the US Constitut

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____  DOCKET NUMBER _____

DATE  Oct. 18, 2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____



**TO:**

Clerk of the Court
US District Court Eastern District
of Michigan
Theodore Levin US Courthouse
231 W. Lafayette Blvd
Room 564
Detroit, MI 48226

**FROM:**

Gabe H. Kaimowitz, Esq
4411 S.W. 34th St. #A305
Gainesville, FL 32608

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; July 2022; All rights reserved.

UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL**

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED

USPS.COM/PICKUP

To schedule free Package Pickup,
scan the QR code.

EP14F July 2022
OD: 12 1/2 x 9 1/2

PS00001000014

■ Expected delivery date specified for domestic use.
■ Domestic shipments include $100 of insurance (restrictions apply).*
■ USPS Tracking® service included for domestic and many international destinations.
■ Limited international insurance.**
■ When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

PRESS FIRMLY TO SEAL

Retail

U.S. POSTAGE PAID
PM
GAINESVILLE, FL 32608

RDC 03

R2305E123831-18

CERTIFIED MAIL

7020 0090 0000 2354 1463